**G–I HOLDINGS, INC., Plaintiff,**

v.

**BARON & BUDD; Frederick Baron; Russell Budd; Ness, Motley, Loadholt, Richardson & Poole; Ronald Motley; Joseph Rice; Weitz & Luxenberg; Perry Weitz and Robert Gordon, Defendants.**

No. 01 CIV. 0216(RWS).

United States District Court, S.D. New York.

Dec. 11, 2001.

Friedman, Wang & Bleiberg, New York City, by Peter N. Wang, of counsel, Cahill Gordon & Reindel, New York City, by Thomas J. Kavaler, of counsel, Washington Legal Foundation, Amicus Curiae, Washington, DC, by Daniel J. Popeo, Richard A. Samp, of counsel, Robert J. Randell, Amicus Curiae, New York City, for Plaintiff.

Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York City, by Mark C. Zauderer, Jonathan D. Lupkin, of counsel, Manatt, Phelps & Phillips, Washington, DC, by Abbe David Lowell, Pamela J. Marple, of counsel, for Baron & Budd, Frederick Baron and Russell Budd.

Storch Amini & Munves, New York City, for Ness, Motley, Loadholt, Richardson & Poole, Ronald Motley and Joseph Rice.

Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, by Elkan Abramowitz, Lawrence S. Bader, Robert M. Radick, of counsel, for Weitz & Luxenberg, Perry Weitz & Robert Gordon.

## OPINION

SWEET, District Judge.

Defendant law firms Baron & Budd, Ness Motley, Loadholt, Richardson & Poole ("Ness Motley"), and Weitz & Luxenberg, and individual defendants Russell Budd ("Budd"), Frederick Baron ("Baron"), Ronald Motley ("Motley"), Joseph Rice ("Rice"), Perry Weitz ("Weitz") and Robert Gordon ("Gordon") (collectively, the "Defendants") have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the First Amended Complaint of G–1 Holdings ("Holdings") in its entirety.

This promises to be a hard fought battle between the successor to an asbestos manufacturer and the defendant law firms and their partners. Holdings seeks retribution against the Defendants for prosecuting fraudulent claims against its predecessor manufacturer which resulted in its bankruptcy and improperly thwarting legislation to deal with the asbestos litigation crisis. To contain and categorize this fight in terms of *prima facie* tort, antitrust, racketeering and contract concepts is a complex and challenging undertaking in which skilled counsel for both sides have been diligent and helpful. For the reasons set forth below, the *prima facie* tort claim (Claim I) is dismissed, the tortious interference with contract claim (Claim II) is dismissed, the tortious interference with economic advantage (Claim II) survives, the antitrust claim (Claim III) is dismissed, the RICO claim (Claims IV–VI) is dismissed for failure to plead predicate acts of witness tampering and extortion and to plead fraud with particularity, the RICO conspiracy claim (Claim VII) is dismissed, the contract claim (Claims VIII and IX) survives and the fraudulent inducement claim (Claim X) is dismissed.

### Parties

Holdings is a New Jersey corporation and is a holding company which includes certain former asbestos manufacturers. and is the successor by merger to GAF Corporation ("GAF"). Plaintiffs have initiated many thousands of tort actions against GAF Corporation and Holdings arising out of the manufacture of a product known as Calsilite, an insulation product containing asbestos.

The Defendants are law firms and their principals. They have represented many of the plaintiffs in the asbestos litigation against Holdings.

### Prior Proceedings

This action was initiated by the filing of an action by Holdings against the Defendants on or about January 10, 2001, alleg-

ing violations of the federal Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. § 1961 et seq. ("RICO"). The First Amended Complaint (the "Complaint") under consideration here was filed on April 30, 2001 and alleges *inter alia* that the Defendants engaged in a scheme to inundate the judicial system, and Holdings, with hundreds of thousands of asbestos cases without regard to their merit, and in various illegal acts in connection with such litigation including suborning false testimony. The Complaint contains ten counts and alleges that Defendants (1) maliciously interfered with GAF's right to petition Congress (*prima facie* tort) (Claim I), (2) tortiously interfered with GAF's contracts and economic advantage (Claim II) (3) violated federal antitrust law (Claim III), (4) violated the RICO statute (Claims IV–VII), (5) breached its contracts with GAF (Counts VIII, IX), and (6) fraudulently induced GAF to enter into contracts they never intended to honor (Count X).

The instant motion to dismiss was filed June 4, 2001 and was marked fully submitted on September 5, 2001, at which time oral argument was heard.

### The Factual Allegations of the Complaint

None of the facts set forth below represent findings by the Court. As befits a motion to dismiss under Rule 12(b)(6) Fed. R.Civ.P., the facts are assumed to be as alleged in the complaint for purposes of the instant motion.

### The Asbestos Litigation

For many years prior to the late 1960's, asbestos was considered a strategic military resource, widely used in the United States in numerous military, industrial and commercial applications, including the production of high-temperature thermal insulation and fire retardant products. Over time, it was discovered that the application and removal of certain asbestos-containing products (friable asbestos products) created airborne dust containing asbestos fibers. In the late 1960's, medical studies emerged linking the inhalation of asbestos fibers to malignant diseases and nonmalignant asbestosis, a scarring of lung tissue accompanied by an impairment of lung function. As a result, the manufacture of friable asbestos-containing products essentially ceased in the early 1970's. Soon thereafter, lawsuits began to be filed seeking damages for personal injury as a result of exposure to asbestos. What started as a trickle soon turned into a tide of litigation on a scope not previously seen before.

Prior to the dissemination of the medical studies, dozens of companies in the United States manufactured asbestos-containing products. One such manufacturer was the Ruberoid Company. In the 1940's and 1950's, Ruberoid manufactured for the United States Navy, as well as others, in accordance with government specifications, a product called Calsilite—a thermal insulation product used to protect steam lines on ships and other high temperature applications. In 1967, the Ruberoid Company merged with General Aniline and Film Corporation. Prior to the merger, General Aniline and Film Corporation neither manufactured nor sold any asbestos-containing products. Shortly after the merger, all manufacture of Calsilite was halted. The GAF Corporation came into existence in 1987 and in 1989 was liquidated, and its assets and liabilities were thereafter acquired by GAF Building Materials Corporation. GAF has been named as a defendant in tens of thousands of asbestos personal injury lawsuits, and it has defended such lawsuits in its own name.

As the number of asbestos filings grew, certain law firms came to dominate asbestos litigation. Defendants Baron & Budd, Ness Motley, and Weitz & Luxenberg are

three law firms that have spent more than twenty years litigating asbestos claims in courts throughout the country.

In 1978, approximately 125 plaintiffs' asbestos attorneys banded together to form and fund the Asbestos Litigation Group ("ALG") in order to promote asbestos litigation. Defendants were active in and effectively controlled the ALG. Acting jointly through the ALG, and through less formal asbestos-related organizations, defendants solicited tens of thousands of asbestos claimants and sued manufacturers without regard for, or in conscious disregard of, the merits of their claims against particular individual defendants such as GAF.

Defendants have received profits from their litigation by, among other things, charging their clients contingency fees, as high as fifty percent in some cases, notwithstanding the fact that many of these cases involve virtually no risk of non-recovery. It is estimated by Holdings that the Defendants have obtained billions of dollars in fees as a result of their role in asbestos litigation.

Defendants have used the profits from asbestos litigation to expand their recruiting network, enabling them to solicit tens of thousands of additional clients on a nationwide basis and through advertising in union and trade publications, which publications were mailed to the membership of virtually every trade union that ever worked near or within an industry even tangentially associated with asbestos, such as steelworkers and masons. Defendants also have established a local counsel network, which reaches into virtually every jurisdiction in the United States, to file claims on behalf of the claimants so solicited. Pursuant to agreements with each network member, a share of the fees thus generated is typically channeled back to the referring ALG member, and ultimately to the ALG, to be invested in future claimant solicitations, including mailed advertisements in newsletters. This has resulted in the filing of further claims.

Because most American asbestos manufacturers stopped manufacturing friable asbestos products in the 1970's, the most severe instances of asbestos exposure occurred during and immediately after World War II. Given the average gestation period for asbestos-related illnesses of approximately 30 years, the number of seriously ill plaintiffs has substantially diminished over time. Thus, the number of legitimate asbestos claims began to decrease in the late 1980's as did the number of solvent asbestos companies.

In 1982, Johns–Manville Corporation ("Manville"), the largest U.S. manufacturer and supplier of construction products containing friable asbestos fibers, filed for bankruptcy protection. Since then, asbestos litigation has driven some twenty-five additional companies into bankruptcy, including, most recently, such major companies as GAF, Owens Corning, The Babcock & Wilcox Company, Armstrong World Industries Inc., Pittsburgh Corning Corporation, and W.R. Grace and Company. In the wake of the many asbestos-related bankruptcies, the Defendants targeted the solvent companies, by encouraging their clients to identify those companies' products as the source of their primary exposure. For example, after the Manville bankruptcy, asbestos plaintiffs' testimony abruptly appeared to shift from targeting Manville products to targeting the products of other still-solvent manufacturers.

In response to all of the above factors, Defendants resorted to unethical and improper conduct to keep their asbestos litigation machine running at full tilt. After having largely exhausted the supply of plaintiffs who actually became sick as the result of prolonged exposure to asbestos,

Defendants increasingly solicited non-sick claimants who can allege, merely, that they were exposed to asbestos at some point in time. Defendants have then tutored these solicited clients to identify the products of the few remaining viable asbestos defendants as the source of their exposure.

Thus, despite the settlement of most of the legitimate asbestos claims, over 150,000 asbestos cases are still pending against GAF and were, prior to January 5, 2001, being filed against the company at a rate of almost 70,000 per year. The vast majority of claimants in these cases do not suffer from cancer or asbestosis and, in fact, have no impairment of lung function at all.

Many of the claims filed by Defendants are or should be known by them to be completely meritless.

It has been and continues to be Defendants' strategy to inundate asbestos defendants with lawsuits regardless of the merits of the allegations so that those companies cannot defend themselves against each individual claim and are compelled to agree to massive group settlements that include an ever-increasing proportion of non-sick claimants.

In addition to overwhelming the asbestos defendants and the judicial system with a torrent of claims that cannot reasonably be adjudicated on an individualized basis, the Defendants have held the claims of their legitimately sick clients hostage by refusing to settle those claims while assembling huge inventories of non-sick claimants. This practice enables the Defendants to use the claims of sick clients to leverage large aggregate settlements of claims that have no merit. Once such aggregate settlements are concluded, the Defendants take it upon themselves to apportion what is left of the settlement dollars, after their fees and expenses are deducted, among their clients. The clients are not informed as to the basis of the allocation, and the non-sick clients are substantially overpaid relative to their truly sick counterparts.

As a result of these practices, the Defendants' few sick claimants have waited years and some have even died before receiving compensation. Also, by settling on this "book of business" basis, the Defendants effectively make it impossible for their clients to make an informed decision about whether the settlements are fair and reasonable based on their own individual circumstances.

### Fabricating False Evidence

In furtherance of their scheme, the Defendants have also encouraged asbestos claimants and other witnesses to fabricate evidence to overcome the obstacles posed by non-sick plaintiffs, faded memories, meritorious defenses and the reduced number of viable companies that can still be named in asbestos lawsuits. These practices have been utilized in order to enhance the settlement value of asbestos cases and, thus, the amount of fees earned, all at the expense of GAF and the other companies that have been forced to pay out billions of dollars on non-meritorious claims.

Since numerous companies have produced asbestos products, the liability of any particular company depends upon the existence of evidence that the claimant involved actually had been exposed to that company's product. In most instances, this requires that the client testify that he was exposed to the product. To ensure this result, Baron & Budd has used a "Product Identification Department," staffed by "Product ID" paralegals, whose job it is to make certain that the client affirmatively identifies specific products from his purported memory and that the

client identify the "right" product, *i.e.*, one that was sold by a still solvent company.

The fabrication of product identification evidence is not limited to Baron & Budd but is a pervasive practice employed by the Defendants and their affiliates. W.R. Grace and Company is but the most recent producer to note that the bankruptcy of one or more former asbestos producers creates a "spike" in claims against those former producers that are still solvent. If product identifications were truthful, the solvency or insolvency of one former producer would have no effect on the assertion of claims against other former producers because a company's solvency cannot legitimately affect a claimant's *bona fide* recollection as to the products to which he or she was exposed.

Consistent with their efforts to fabricate product identification evidence, the Defendants have also encouraged the fabrication of false testimony to stack the litigation deck in their favor. To that end, Baron & Budd went so far as to author a 20–page script entitled, "Preparing for Your Deposition" (the "Memorandum") to assist the firm's clients in providing helpful deposition testimony. The Memorandum goes beyond providing general tips on how a witness should conduct himself or herself during a deposition and provides specific "facts" that all clients should testify to, specific responses that all clients should give, and specific information all clients should not divulge, regardless of what the truth might be in a particular case. The Memorandum counsels witnesses to memorize the information contained in the "Work History Sheets" created by Baron & Budd paralegals and otherwise coaches clients on hints and signals that will help them determine what the "right" answer is. Nowhere does the Memorandum instruct its reader to tell the truth, and the clear import of the Memorandum is that the helpful, and necessary, "right" answer is all that matters, regardless of the truth.

For example, the Memorandum contains a series of instructions telling witnesses to identify only those products listed on the Work History Sheets prepared by Baron & Budd lest the witness identify the product of a bankrupt entity from whom no damages or attorneys' fees could be collected. The Memorandum urges claimants to memorize the product names provided by Baron & Budd on the "Work History Sheets" and to testify that they actually saw those names on containers where they worked.

Through the distribution of the Memorandum, Baron & Budd also encouraged its clients to testify only about the installation of new products (which theoretically could be identified by its container) and not to admit that some or all of their exposure arose from the replacement or removal of old products that could not be identified by brand.

The Memorandum instructs clients falsely to claim equal exposure to all products and to deny that they ever saw any warnings or had any knowledge concerning the harmful effects of asbestos.

The Memorandum also contains a series of pointers on how witnesses can guess the "right" answers where they have no independent knowledge or recollection and carefully instructs the witness how to take cues and interpret signals from Baron & Budd attorneys during the deposition.

For example, the memorandum instructs clients:

- to testify that "I KNOW it was that brand because I saw the names on the container!"

- to "testify ONLY about INSTALLATION of NEW asbestos, NOT tearout of the OLD stuff. This is because

it is almost impossible to prove what brand of material was being torn out."

- that "You will be asked if you ever saw any WARNING labels on containers of asbestos. It is important to maintain that you NEVER saw any labels on asbestos products that said WARNING or DANGER."

Baron & Budd conducted regular in-house training sessions concerning the giving of misleading and false deposition testimony and issued various memoranda instructing employees how to prepare clients for giving testimony without regard to its truth.

In an apparent effort to cover the tracks of their fraudulent coaching, the Memorandum also instructs clients that, "You may be asked how you are able to recall so many product names. The best answer is to say that you recall seeing the names on the container or on the product itself. . The more you thought about it, the more you remembered." Most revealing, and in apparent acknowledgment of the fact that asbestos product identification and other matters may be independently (or "creatively") added to litigation materials by Baron & Budd, the Memorandum instructs, "[S]ay that a girl from Baron & Budd showed you the picture of MANY products, and you picked out the ones you remembered." It offers further that, "If there is a MISTAKE on your Work History Sheets, explain that the 'girl from Baron & Budd' must have misunderstood what you told her when she wrote it down."

The Complaint also alleges the Baron & Budd Defendants' created and delivered false affidavits in connection with mass settlements.

76. As a prerequisite to implementation of certain mass settlements with (among others) GAF, Defendants were required to provide sworn affidavits from their clients stating the specific asbestos-containing products to which these clients had been exposed during the relevant time periods. Such affidavits were essential to the consummation of these settlement agreements.

77. Upon information and belief, many Baron & Budd clients were reluctant to sign the affidavits, as they had no recollection of the products to which they had been exposed and were afraid that, if they signed the affidavits, they might be required to go to court. Upon information and belief, Baron & Budd personnel would persuade these clients to sign the affidavits by assuring them that this was a purely mechanical process—they needed only sign the document, have it notarized, and send it in, and they would then be assured of receiving money.

78. Upon information and belief, as a result of this inducement, Baron & Budd clients signed affidavits in which they swore under oath that they were exposed to specific products when they had no independent recollection that they had been. Upon information and belief, although Baron & Budd employees were aware that the affidavits were false at the time they were signed, Baron & Budd nonetheless presented these affidavits to asbestos Defendants, including plaintiff, as true.

79. These false and fraudulent affidavits were submitted to plaintiff and/or its agent through the United States mails and/or by private or commercial interstate carrier.

80. In reliance on Baron & Budd's fraudulent assertion that such affidavits were true, asbestos Defendants, including plaintiff, paid out millions of dollars in asbestos settlements that they otherwise would not have paid, a large portion of which was paid to Baron & Budd in attorneys' fees.

Baron & Budd's encouragement of false testimony was not limited to depositions. As a prerequisite to implementation of certain mass settlements with GAF, among others, the Defendants were required to provide sworn affidavits from their clients stating the specific asbestos-containing products to which these clients had been exposed during the relevant time periods. Such affidavits were essential to the consummation of these settlement agreements.

Many Baron & Budd clients were reluctant to sign the affidavits, as they had no recollection of the products to which they had been exposed and were afraid that if they signed the affidavits, they might be required to go to court. Baron & Budd personnel would persuade these clients to sign the affidavits by assuring them that this was a purely mechanical process, that they needed only sign the document, have it notarized, and send it in, and they would then be assured of receiving money.

As a result of this inducement, Baron & Budd clients signed affidavits in which they swore under oath that they were exposed to specific products when they had no independent recollection that they had been. Although Baron & Budd employees were aware that the affidavits were false at the time they were signed, Baron & Budd nonetheless presented these affidavits to asbestos defendants, including Holdings and its predecessors, as true.

In reliance on Baron & Budd's fraudulent assertion that such affidavits were true, asbestos defendants, including Holdings, paid out millions of dollars in asbestos settlements that they otherwise would not have paid, a large portion of which was paid to Baron & Budd in attorneys' fees.

The Defendants' efforts to manufacture favorable testimony was not limited to the scripting of claimants' testimony. Baron & Budd, along with Ness Motley, hired doctors who attributed virtually any lung abnormality to asbestos exposure, regardless of what the medical evidence actually showed.

Defendant Ness Motley provided a different form of inducement to medical experts to obtain their favorable testimony. Certain of defendant Ness Motley's female secretaries and paralegals were expected to, and did, "entertain" expert witnesses who would visit the firm in connection with pending asbestos litigation. At least one partner of the firm indicated to his secretary that she should have sex with a particular expert witness, and Motley supplied several female employees with cash and encouraged them to "be nice to" certain of the firm's experts and out-of-state co-counsel.

These practices induced false and misleading testimony to be given by expert witnesses in support of claims brought against GAF and others, which resulted in GAF's payment of inflated verdicts and settlements in a number of cases. These inflated verdicts and settlements and, in general, Ness Motley's ability to produce on demand whatever medical testimony it needed, also had the effect of raising the "going rate" for settlement of Ness Motley's cases, thereby causing GAF additional injury.

### Shutting Down Opposition to Reform Legislation

Well aware of the effect that asbestos litigation was having on both state and federal courts, in 1990 the Chief Justice of the United States appointed a Judicial Conference Ad Hoc Committee on Asbestos Litigation to investigate and report on the growing problem posed by the flood of claims. In its 1991 Report, the Ad Hoc Committee found that:

[D]ockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.

The Ad Hoc committee's report concluded that the situation required the creation of a national asbestos dispute resolution scheme, and on the basis of that report, the Judicial Conference of the United States urged Congress to do so.

In 1993, following a series of discussions among representatives of the asbestos plaintiffs' bar and The Center for Claims Resolution ("CCR"), of which GAF was a member, a global, class action settlement was reached, affecting all current and future asbestos claims asserted against GAF and the other then-members of the CCR. This settlement, which is commonly referred to as the *Georgine* settlement, was approved by the United States District Court for the Eastern District of Pennsylvania, which had before it at the time all of the then-pending federal asbestos cases. The *Georgine* settlement was designed to assure prompt payment with reduced transaction costs to sick individuals through an administrative facility and to defer the claims of non-sick individuals until such time as they became sick.

In June 1997, the *Georgine* settlement was disapproved by the United States Supreme Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The Court had no quarrel with the settlement criteria set forth therein, but determined that the settlement did not comport with the requirements of Rule 23 of the Federal Rules of Civil Procedure. In its opinion in *Amchem*, the Supreme Court urged Congress to implement legislation to establish an asbestos dispute-resolution system, explaining that "a nationwide administrative claims processing regime would provide the most secure, fair, and efficient means of compensating victims of asbestos exposure." *Id.* at 628–29, 117 S.Ct. 2231.[1]

In the wake of *Amchem*, a number of companies formed the Coalition for Asbestos Resolution ("CAR"), the goal of which was to work toward the adoption of legislation establishing a fair and efficient administrative facility for resolving asbestos claims. When it was formed, CAR's members included Kaiser Aluminum Corporation ("Kaiser Aluminum"), Georgia–Pacific Corporation ("Georgia–Pacific"), Westinghouse, United States Gypsum Company ("US Gypsum"), ABB Combustion Engineering, Turner & Newell PLC ("Turner"), Armstrong and GAF.

The Fairness in Asbestos Compensation Act ("FACA" or the "Act") was first introduced in October 1998, near the end of the 105th Congress. With the support of GAF and the CAR, it was reintroduced at the start of the 106th Congress in early 1999. The legislation, which was co-sponsored by over 102 Republican and Democratic senators and congressmen, was designed to compensate individuals who are actually sick and to defer resolution of the claims of "non-sick" individuals until such time as those individuals actually developed an asbestos-related illness.

Pursuant to the Act, an industry-funded national claims facility was to be created that would have applied essentially the same objective medical criteria that were

---

1. Two year later, in the course of striking down another class action asbestos settlement on procedural grounds, the Supreme Court repeated this message in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 821–22, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

embodied in the *Georgine* settlement. These criteria have been approved by leaders in the public health community, including Dr. Louis W. Sullivan, former Secretary of the Department of Health and Human Services, who testified before the House Judiciary Committee that the criteria contained "generous" impairment guidelines that are "designed to ensure that no individual suffering from asbestos-related impairment be excluded from compensation." The FACA eliminated the statute of limitations defense as a bar to recovery for currently non-sick claimants, thus enabling such individuals to obtain fair compensation if and when they become sick in the future.

The Act, unlike the *Georgine* class action settlement, did not impose any limit on the liability of GAF or any other former asbestos producer. What the FACA did cap was Defendants' contingency fees, which were to be limited to 25% of a claimant's recovery. The Act would have dramatically reduced the legal fees and transaction costs associated with asbestos litigation that are alleged to consume approximately 60 cents of every dollar spent on the litigation. The Act would also have expedited compensation of genuinely sick individuals, while preserving for claimants who develop asbestos-related illnesses in the future resources that are now being rapidly depleted by the current process of asbestos litigation. GAF and its Chairman, Samuel J. Heyman ("Heyman"), were active and public supporters of the Act.

The Defendants vigorously opposed the FACA because, by their own estimate, it could have drastically reduced their then-current inventories of claimants by as much as 80% by deferring the resolution of "non-sick" claims, and capping their fees at 25%. Thus, under the leadership of Baron and Rice and through the American Trial Lawyers Association ("ATLA"), of which Baron was president, Defendants and other members of the asbestos bar launched their attack on the Act and on any company that supported it.

### a. *Georgia–Pacific*

The Defendants' tactics with respect to the Act began in 1998 when the Act was first introduced in Congress. To support the proposed legislation, James Kelly ("Kelly") of Georgia–Pacific intended to testify before Congress and prepared a written statement of testimony for the House Judiciary Committee. At the time, Georgia–Pacific was a member of CAR and Kelly was the chair of CAR.

Shortly before Kelly was scheduled to appear before the House Judiciary Committee, one or more of the Defendants met with representatives of Georgia–Pacific and threatened Georgia–Pacific that if Kelly testified in support of the Act and if Georgia–Pacific otherwise continued to support the reform effort, Defendants would wreak economic havoc on Georgia–Pacific through asbestos litigation. As a result of the threats, Kelly abruptly resigned his position as chair of CAR, and had his company, Georgia–Pacific, withdraw from the organization.

The Defendants' prior attempts to strong-arm their opponent had driven numerous companies into bankruptcy. Owens Corning was the first. As a result of the Defendants' extortionate threats, Owens Corning was ultimately forced to abandon its defense efforts rather than face bankruptcy.

Threatening asbestos defendants is alleged to have been a regular course of conduct for Defendants. When W.R. Grace and Company and Raymark attempted to expose the fraudulent use of the Baron & Budd Memorandum in litigation, they too were visited by the Defendants with a campaign of retaliation and

intimidation. The campaign was wholly successful; both companies were driven into bankruptcy as a result.

### b. *The February 24 Meeting*

In February 1999, Rice, on behalf of the Defendants and other firms working with them, invited the remaining companies supporting the Act and several other former asbestos producers to a meeting on February 24. The invitation stated that the plaintiffs' attorneys calling the meeting represented 80% of the pending asbestos plaintiffs' cases, and that they sought a meeting for a "frank discussion" of the current status of the national asbestos litigation.

The February 24 meeting was attended on the asbestos plaintiffs' side by Rice, Motley, Baron, Weitz and Gordon, among others. Representatives of GAF, Kaiser Aluminum, W.R. Grace and Company, Owens Corning, Owens–Illinois, Inc., U.S. Gypsum and others were also present. The meeting was chaired by Rice.

At the meeting, representatives of GAF made it clear that Heyman expected to testify before Congress in support of the Act. Rice and his co-conspirators made it equally clear that they would do whatever it took to kill the Act, including retaliating against any company that supported it, specifically including GAF. Motley also threatened that if Heyman persisted in his support of the legislation, he would be targeted for personal retaliation as well.

Acting as spokesman for the group, Rice stated that efforts to promote or support the Act were viewed by the Defendants as starting a "nuclear war." He insisted that the Defendants were prepared to "fight on whatever level necessary" to defeat the legislation. He also threatened that further support for the Act would result in "war" that would break out on every front, and that any company that did not re-

nounce its support for the legislation would be engulfed in asbestos litigation that "will rage like a fire you will never control."

As a result of the extortionate threats made at the February 24 meeting, ABB Combustion Engineering withdrew from the CAR.

### c. *The April 8 Meeting*

Two days after the February 24 meeting, defendant Rice, on behalf of the Defendants and the other asbestos plaintiffs' attorneys, invited the industry participants to a follow-up meeting to be held on April 8, 1999. On the evening before the April 8 meeting, the Defendants and their fellow asbestos lawyers met secretly with one of Washington's leading lobbyists, who informed them that there was a serious chance for passage of the Act.

At the April 8 meeting, the Defendants threatened, intimidated and coerced the former asbestos producing companies in even harsher terms to oppose the Act. Defendants threatened that they would financially cripple any company supporting the Act. To that end, Rice and others made it clear that withdrawing support for the Act was no longer enough and that the Defendants were now demanding that companies sign letters opposing the Act, thereby misrepresenting their companies' actual view.

Rice further stated that the asbestos plaintiffs' attorneys had agreed that companies "supporting the legislative effort do not have common interest with the rest of us," and "shouldn't be here." He specifically identified GAF as such a company and stated that the asbestos plaintiffs' attorneys were united in the demand that the representatives of GAF, whom he identified, leave the meeting. This message was echoed by Weitz, who announced that he and his colleagues "were not prepared

to have discussions with anyone endorsing the legislation" and that they "needed to know which Defendants stood on which side of the river."

F. Kenneth Bailey ("Bailey"), of Williams Bailey Law Firm, LLP ("Williams Bailey"), spoke next. Bailey, on behalf of Williams Bailey, is party to a settlement agreement relating to asbestos litigation pending in Texas, in which Williams Bailey undertook to recommend to its clients the acceptance of agreed-upon settlement amounts. Nonetheless, Bailey stated that as a result of GAF's support of the Act, he would recommend to his clients not to accept any settlements with the CCR, and would go to trial in all cases against the members of the CCR. Weitz, whose firm is party to a similar settlement agreement relating to New York-based claims, similarly stated that he and his firm would likewise no longer settle any cases with the CCR as a result of GAF's support of the Act.

Weitz also identified Kaiser Aluminum as another supporter of the Act that would be targeted. At that time, Weitz was in possession of the final draft of a settlement agreement with Kaiser Aluminum. Weitz stated that if Kaiser Aluminum supported the Act, he would not enter into any settlements with it and that any former asbestos producer that was supporting the Act would become the target of a crushing number of new claims.

The Defendants and the other asbestos plaintiffs' attorneys then left the room and caucused. When they returned, Rice, on behalf of all the asbestos plaintiffs' lawyers, stated that from that point on they would refuse to meet with any company that had not, in advance, provided to them a written statement stating that the company opposed the Act. Rice stated that the asbestos plaintiffs' lawyers in attendance had just discussed the matter and

were "monolithic on this." Addressing the room, he asked if any of the other plaintiff's lawyers disagreed with that assertion. None did.

Representatives of GAF stated that they wished to continue to attend any meetings between the asbestos plaintiff's bar and asbestos litigation defendants. Rice then insisted that all of GAF representatives, including the company's general counsel, leave the meeting.

Shortly after the April 8 meeting, and as a result of the extortionate threats made at that meeting and the earlier meeting on February 24, Kaiser Aluminum, Westinghouse, U.S. Gypsum, Turner and Armstrong withdrew from the CAR.

### d. *The April 12 Meeting*

Having successfully extorted the other CAR members to bow to their demands, the Defendants zeroed in on GAF. On April 12, 1999, Weitz and Gordon met with GAF's general counsel and reiterated the threats of the two prior meetings. They stated that if GAF continued to support the Act, there would be "full-fledged war," and the asbestos plaintiffs' bar would have a "nuclear response," that the asbestos plaintiffs' bar wanted to isolate GAF to send the message to all other asbestos litigation defendants, that actual opposition to the Act was the only means by which asbestos defendants would be permitted to negotiate with the asbestos plaintiffs' bar, that, regarding the Act, the goal was not merely to win but to destroy any opposition, that the asbestos plaintiffs' bar would make GAF the main target in the asbestos litigation, and that GAF would have to make a decision within the next few days that would determine whether the company would survive.

After the meeting with GAF, the Defendants decided to increase the pressure by

other means. They turned their sights on CCR and threatened, *inter alia,* that they would stop settling cases with the CCR and extract a premium for settling cases as long as GAF continued its support of the Act and remained a member of the CCR. The pressure was extremely effective. On December 27, 1999, CCR expelled GAF from membership. Stripped of the protections afforded by being a member of the CCR, GAF became an easier target for the Defendants, who sharply escalated their settlement demands in connection with cases then pending against GAF.

The legislation was defeated. As a result, the Defendants continue to litigate meritless claims today. Making good on their threats, the Defendants along with their colleagues in the plaintiffs' asbestos bar filed a large number of new claims, and GAF went into bankruptcy on January 5, 2000.

### Defendants' Alleged Abrogation of the Futures Agreements

In connection with the negotiation of the *Georgine* settlement, the CCR had entered into so-called futures agreements ("Futures Agreements") with many of the nation's leading plaintiffs' asbestos law firms, including Weitz & Luxenberg and Ness Motley, and firms affiliated with Ness Motley ("Affiliated Firms"). The Futures Agreements served as a corollary to the *Georgine* settlement by incorporated the *Georgine* medical criteria and providing a mechanism by which any future filing of claims by "non-sick" individuals would be deferred, even if the *Georgine* settlement was ultimately not upheld on appeal. The Futures Agreements further provided that the CCR would as an alternative dispute resolution mechanism toll the running of the statute of limitations for Defendants' clients (and future clients) who did not have any of the conditions set forth in the *Georgine* medical criteria (and whose claims were not already time barred). The Defendants agreed, in turn, to recommend to their clients that they defer filing an asbestos claim until they met the criteria.

In this way, the Futures Agreements provided added assurance to GAF and the other CCR members that regardless of the fate of the *Georgine* settlement in the appellate courts, those companies would not be subjected to the tremendous litigation costs associated with defending tens of thousands of claims by plaintiffs who had not developed (and might never develop) an asbestos-related disease.

In entering into the Futures Agreements at the time of the *Georgine* settlement, the Defendants represented that they believed that the *Georgine* medical criteria were "reasonable" and that acceptance of the ADR procedure "will be in the interest of its future clients who do not have a medical condition" defined by the criteria in the Agreement "in that it offers such clients an alternative to immediate litigation or settlement and release of their claims for asbestos injury." The typical Futures Agreement expressly states that the subscribing firm will:

> recommend that its clients seriously consider this alternative dispute resolution procedure. With respect to all clients who accept this alternative dispute resolution procedure, [defendant law firm] agrees to defer filing any asbestos-related personal injury claims against CCR or any of its current members until such time, if ever, as the claimant develops one of the asbestos-related diseases described [herein].

The Futures Agreements formed a substantial part of the inducement for CCR's agreement to settle some 50,000 pending asbestos cases for approximately $750 million. That sum was paid to Defendants by CCR. Ness Motley, Weitz & Luxenberg

and their affiliated firms received a substantial portion of this $750 million and retained significant share of those funds for their own accounts, as attorneys' fees. GAF contributed approximately $200 million toward the $750 million settlement payment and did so in reliance on the plaintiffs' lawyers' commitment to adhere to the medical criteria and procedures set forth in the Futures Agreements. GAF would never have agreed to pay such sums had it known that Ness Motley, Weitz & Luxenberg and the affiliated law firms had no intention of adhering to the commitments set forth in the Futures Agreements.

By their express terms, the Futures Agreements were triggered by the *Amchem* decision rejecting the *Georgine* settlement and became binding upon the participants. Nonetheless, despite the plain language of the Futures Agreements and the hundreds of millions of dollars they received in connection with them, Weitz & Luxenberg and Ness Motley immediately breached their obligation to recommend the ADR procedure and the deferral of claims on behalf of non-sick clients. Indeed, following the lifting of the injunction that was entered by the District Court that approved the *Georgine* settlement, Weitz & Luxenberg and Ness Motley and, at the direction of Ness Motley, the affiliated law firms, began filing non-sick claims at an ever greater rate than they had filed them before the *Georgine* settlement, and continued to do so unabated at least until the GAF bankruptcy.

## CONCLUSIONS

### I. *Legal Standard on a Motion to Dismiss*

The standard of review under Rule 12(b)(6) requires the court to accept as true all reasonable inferences which can be drawn from the complaint. A complaint is not to be dismissed unless it appears "be-yond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *accord Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

### *The Applicable Law*

A federal court sitting in diversity applies the choice of law principles of the forum state to decide which state's substantive law controls. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, when the forum state is New York, "[a] court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict." *Simon v. Philip Morris Inc.,* 124 F.Supp.2d 46, 70 (E.D.N.Y.2000) (*citing Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998)).

Laws are in material conflict if the differences in the laws "have a significant possible effect on the outcome of the trial." *Simon,* 124 F.Supp.2d at 70. Consequently, "[i]f the party urging a choice of law analysis fails to demonstrate a true conflict between New York and another state's laws, no choice of law analysis need be undertaken." *Bass v. World Wrestling Fed. Entertainment, Inc.,* 129 F.Supp.2d 491, 504 (E.D.N.Y.2001).

When the law of a particular state is not established, federal courts sitting in diversity predict how the state court would resolve any ambiguities. *Fieger v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 399 (2d Cir.2001) (*citing Michalski v. Home Depot, Inc.,* 225 F.3d 113, 116 (2d Cir.2000)). To do so courts look to decisions of the state's trial and appellate courts. *Michalski,* 225 F.3d at 116.

Holdings raises a choice of law issue as to the *prima facie* tort claim, the tortious interference claims, the breach of contract claim and the fraudulent inducement claim, arguing for the application of New Jersey law in each instance. As to each of the issues concerning which Holdings raises a choice of law issue, there is no material difference between New Jersey and New York law, and New York law will be applied. As to each choice of law question raised, the issue is considered in each of the relevant sections of the opinion as set forth below.

## II. The Complaint Fails to Allege a Valid Cause of Action for Prima Facie Tort Under New York Law

Claim I of the Complaint alleges malicious interference with, and conspiracy to interfere with the right to petition Congress (*prima facie* tort). In support of this claim, Holdings alleges that GAF possessed the right to petition government and that the Defendants interfered with this right in such a manner as to constitute a *prima facie* tort.

### New York Law Applies

New Jersey law recognizes an action for *prima facie* tort but has not yet set forth the pleading or other requirements for the doctrine. Despite minimal references to *prima facie* tort in New Jersey case law and even scarcer discussion of the doctrine, in 1998 the New Jersey Supreme Court finally discussed the doctrine in *Taylor v. Metzger*, 152 N.J. 490, 706 A.2d 685 (N.J.1998). Holdings cites *Taylor* for the proposition that New Jersey would apply the Restatement's *prima facie* tort formulation. However, in affirming the dismissal of a *prima facie* tort claim in *Taylor*, the New Jersey Supreme Court first outlined the general nature of *prima facie* tort, citing to the Restatement (Second) of Torts as well as to the New York

case of *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985). *See Taylor*, 706 A.2d at 700. In contrast to the Restatement formulation, the *Freihofer* court specifies the pleading requirements for *prima facie* tort.

Because New Jersey has not set forth pleading requirements for a claim of *prima facie* tort, a question is presented as to the resolution that the New Jersey courts would adopt. *Fieger*, 251 F.3d at 399. In *Taylor*, the New Jersey Supreme Court did not rely upon the Restatement of Torts to describe the general nature of a *prima facie* tort but to the Restatement *and* a New York case which sets forth the New York's pleading requirements. For its factual holding, it relied on a law review article, a New Mexico case and another New York case, without citing the Restatement. *See Taylor*, 706 A.2d at 700.

Further, the few holdings present in cases under New Jersey law comport with those of New York cases. *See, e.g., Bishop v. Inacom, Inc.*, No. Civ. A. 99–664, 1999 WL 1416919 (D.N.J.1999) (stating that no prima facie tort claim could lie unless the plaintiff established "that [the defendant] in fact owed a duty to act in a certain manner" *id.* at *10 (*citing Riggs v. Schappell*, 939 F.Supp. 321, 329 (D.N.J.1996); *Brody v. Albert Lifson & Sons*, 17 N.J. 383, 111 A.2d 504 (1955)) and rejecting the claim). This further supports the conclusion that a New Jersey court would adopt the pleading standards applied under New York law. *See Michalski*, 225 F.3d at 116 ("Other data" to use in predicting how a state court would resolve an ambiguity in state law "include relevant case law from other jurisdictions on the same or analogous issues, scholarly writings in the field, and any other resources available to the state's highest court").

In this instance, there is no genuine conflict. Holdings cites *Lombard v. Economic Development Admin. of Puerto Rico,* No. 94 Civ. 1050, 1995 WL 447651 (S.D.N.Y. July 27, 1995), for the proposition that "causes of action with differing elements" are in conflict. However, that case is inapplicable here because New Jersey simply has no detailed elements, such as pleading requirements. Consequently, elements that have not been developed cannot be in conflict with those in New York.

Because there is no material conflict in the applicable law, New York law is appropriately applied to this cause of action.

### The Complaint Does Not Adequately Plead Disinterested Malevolence

■ To plead a cause of action for *prima facie* tort adequately under New York law, a plaintiff must allege (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful. *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990) (applying New York law). The difference between the formulation in New York and that adopted by the Restatement (Second) of Torts § 870, is a requirement that the "sole motivation for the damaging acts has been a malicious intention to injure the plaintiff." *Twin Labs.,* 900 F.2d at 570. Holdings pleads that the Defendants' conduct was undertaken:

> initially so that plaintiff would desist from supporting the Act and thereafter as an object lesson to plaintiff, and the universe of asbestos Defendants in general, as to the harm that would befall those that did not toe the line.

■ The Defendants maintain that this allegation concedes that the conduct was motivated by other factors than a malicious intent to injure the plaintiff: (1) a desire to encourage plaintiffs to desist from supporting the Act, (2) to encourage others to toe the line, and (3) to prevent the passage of a bill they considered harmful to their interests. As the Second Circuit noted in *Twin Labs,* "motives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim." *Id.* 900 F.2d at 570 (citation omitted).

■ When a plaintiff sets forth allegations that indicate that other motives were involved in the complained of conduct besides disinterested malevolence, the cause of action must be dismissed. *See e.g., Lennon v. Seaman,* 63 F.Supp.2d 428, 434 (S.D.N.Y.1999) ("[P]laintiff has actually alleged that the defendants' motivations behind the theft and use of Lennon's items were monetary in nature," thus requiring dismissal of the claim). Here, the facts alleged do not demonstrate that the Defendants were motivated solely by a desire to harm Holdings. In addition to the allegation cited directly above, Holdings alleges that the Defendants' actions were directly motivated by their desire to defeat FACA, alleging that the Defendants made threats and took actions against any company that supported the act. Complaint ¶ 101.

In support of its contention that "sole motivation" has been adequately pleaded, Holdings relies on *Burns, Jackson, Miller, Summit & Spitzer v. Lindner,* 108 Misc.2d 458, 437 N.Y.S.2d 895 (1981), and on the Third Department's decision in *Mahoney v. Temporary Commission of Investigation of the State of New York,* 165 A.D.2d 233, 565 N.Y.S.2d 870 (3d Dep't 1991). According to Holdings, these cases show that a *prima facie* tort claim may survive even when a "sole motivation" of disinterested malevolence has not been pleaded if the end sought to be achieved was legitimately desired and a determination is made weighing the social benefits of the

defendant's actions with the harm to the plaintiff.

However, while the trial court in *Burns, Jackson* denied a motion to dismiss a *prima facie* tort claim on the ground that there was neither a "legal" nor "social justification for the allegedly tortious conduct," 437 N.Y.S.2d at 902–03, the New York Court of Appeals subsequently affirmed the dismissal of that same claim. *See Burns Jackson,* 464 N.Y.S.2d 712, 451 N.E.2d at 468. In so doing, the Court of Appeals relied entirely on the fact that the plaintiff had not alleged that the defendants' sole motivation was "disinterested malevolence." *Id.* The court ignored the trial court's theory that a non-malicious motivation could defeat a claim of *prima facie* tort only if the motivation was legally or socially "legitimate." *Id.*

*Mahoney* is likewise inapposite. In that case, the Appellate Division held that the defendants' justification did not address the specific acts of misconduct alleged. 165 A.D.2d at 239, 565 N.Y.S.2d 870. Here Holdings has affirmatively pleaded that the specific acts of the Defendants were motivated by economic self-interest.

Finally, Holdings contends that it was not until after the Defendants were unable to persuade it to change its position that the Defendants engaged in the alleged conduct underlying the *prima facie* tort. Because the Complaint alleges that the Defendants' conduct occurred after Holdings refused to change its position, Holdings contends that the desire to have it withdraw its support for the Act could no longer have been a motivation for Defendants' actions. *See Kahuna Group, Inc. v. Scarano Boat Building, Inc.,* 984 F.Supp. 109, 115 (N.D.N.Y.1997) (summary judgment motion seeking dismissal of a prima facie tort claim denied because the "alleged tortious conduct continued past the point where [defendants] stood to gain financially from continuing to injure plaintiff"). However, simply because GAF decided to continue supporting the FACA does not establish that the Defendants' continued opposition to the measure, and continued conduct toward Holdings, became acts of disinterested malevolence. Even as the allegations are pleaded, the Defendants continued to have an interest in opposing the act and that defeats Holdings' claim of disinterested malevolence.

The failure to plead disinterested malevolence adequately is fatal to Holdings' *prima facie* tort claim. For the reasons stated, Claim I is dismissed.

### III. The Complaint Fails to State a Claim For Tortious Interference With Contract

Claim II of the Complaint pleads alternative claims for tortious interference with contract and tortious interference with economic advantage. These claims are based on alleged interference with the relationship between GAF and CCR which handled the litigation of claims against it and other manufacturers.

■ Under New York law, the elements of a claim for tortious interference with contract are: (1) existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional procuring of the breach of that contract; and (4) damages. *William Kaufman Organization v. Graham & James LLP,* 269 A.D.2d 171, 173, 703 N.Y.S.2d 439, 442 (1st Dep't 2000). As discussed more fully in this section, New York and New Jersey law do not conflict in any material way with respect to this claim and consequently no decision as to the applicable law need be made. *See, e.g. Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998).

■ Holdings has not adequately pleaded the existence of a valid contract between GAF and CCR. The Complaint states: "Prior to December 17, 1999, plaintiff had a contractual relationship with CCR under which CCR investigated claims, tried cases, and negotiated settlements on a bulk basis on behalf of all of its members, thereby substantially reducing GAF's transaction costs in the asbestos claim resolution process." However, an allegation of interference with "contractual relations" is insufficient where the plaintiff does not refer to a valid, existing contract or any terms of contract with a third party. *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983). Here Holdings has pleaded a "contractual relationship" with CCR and describes the nature of the relationship, and the specific benefits derived from it, but fails to identify a valid, existing contract. *See also Tuff–N–Rumble Management, Inc. v. Sugarhill Music Publishing Inc.*, 49 F.Supp.2d 673, 678 (S.D.N.Y.1999) (applying N.J. law); *Universal Marine Med. Supply v. Lovecchio*, 8 F.Supp.2d 214, 221 (E.D.N.Y.1998) (N.Y. law requires proof of "the existence of a valid contract between itself and a third party for a specific term").

■ Moreover, New York law requires that to plead tortious interference with contract properly, the plaintiff must allege "breach" of an existing contract. *See Robins v. Max Mara, U.S.A., Inc.*, 923 F.Supp. 460, 468 (S.D.N.Y.1996); *see also NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 496 (1996). Additionally, while New Jersey law does not explicitly identify breach as an element of this cause of action, inducing a third party to violate some provision of its contract with the putative plaintiff is implicit in the element of "interference" with the pre-existing contract. *See, e.g., Tuff–N–Rumble*, 49 F.Supp.2d at 678; *Score Board, Inc. v. Upper Deck Co.*, 959 F.Supp. 234, 238 (D.N.J.1997) (interference arose from violation of restrictions of pre-existing contract). Similarly, while the Restatement (Second) of Torts does not identify "breach" as a distinct element of the tort, the commentary to the section is full of references to breach or breaking of contracts. *See* Restatement (Second) of Torts § 766, Comments c, d, f, g, o, p, and q. Therefore, breach of contract must be pleaded.

Breach, however, is not adequately pleaded. Holdings has alleged "[o]n December 17, 1999, CCR expelled GAF from membership" and that "...Defendants caused CCR to expel GAF, thereby deliberately interfering with GAF's ongoing economic and contractual relationship with CCR." According to Holdings, it is entitled to the inference that it can prove facts that demonstrate that its expulsion from the CCR was a breach of the contract between Holdings and the CCR. However, no breach is alleged. Even if Holdings were to prove the above allegation in all respects, there would still be a failure to demonstrate breach of a contract between Holdings and the CCR. Therefore, the claim for tortious interference with contract in Claim II is dismissed.

## IV. *Tortious Interference With Economic Advantage is Adequately Pleaded*

■ Though inadequate to establish a claim for tortious interference with contract, Claim II of the Complaint adequately pleads tortious interference with economic advantage. The elements of a claim for tortious interference with economic advantage are: (1) a prospective contractual relation or business with a third party; (2) defendants' interference with that relation;

(3) defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair or improper means; and (4) injury to the plaintiff. The only elements of a claim for tortious interference with economic advantage that differ from those for a tortious interference with contract are the level of the relationship interfered with and the level of interference. Because courts are more protective of contracts than prospective relationships, a higher degree of interference is required to plead the claim. *See Lane's Floor Coverings, Inc. v. Ardex, Inc.*, 1996 WL 19182, at \*3 (E.D.N.Y. Jan. 4, 1996).

■■■ The allegations discussed above plead the existence of a relationship under which it can recover for tortious interference with a prospective contractual relationship. *Cf. Catskill Development, LLC v. Park Place Entertainment Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001) (plaintiff did not state a claim for tortious interference with contract because the contracts relied upon were unenforceable yet plaintiff nevertheless stated a claim for tortious interference with a prospective contractual relationship).

■■■ To state a claim for tortious interference with economic advantage, a plaintiff must plead facts that demonstrate that "the defendant acted with the sole purpose of harming the plaintiff *or* that the defendant used dishonest, unfair or improper or wrongful means." *See Id.* (Emphasis added). Under the standard articulated by the New York Court of Appeals in *NBT Bancorp, Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 624, 664 N.E.2d 492, 497, 641 N.Y.S.2d 581, 586 (1996) and recognized in *Sepenuk v. Marshall*, 2000 WL 1808977 (S.D.N.Y. Dec.8, 2000), "wrongful" acts are not limited to criminal or fraudulent acts, but include acts that consist of "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone, although it is knowingly directed at interference with the contract." *Id.* (*quoting Guard–Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 191, 406 N.E.2d 445, 449, 428 N.Y.S.2d 628, 632 (1980)).

Here, Holdings has alleged numerous wrongful acts, described fully in the facts section, by Defendants which interfered substantially with the economic relationship established between GAF and CCR. Holdings has thus adequately alleged a cause of action for tortious interference with economic advantage.

For these reasons, Claim II survives as to the allegations of tortious interference with economic advantage and is dismissed as to the tortious interference with contract claim.

## V. *The Complaint Does Not Allege a Valid Cause of Action for Violation of Federal Antitrust Law*

■■■ Claim III of the Complaint pleads a violation of federal antitrust law, 15 U.S.C. § 1. The antitrust claim theory put forth by Holdings in this case is certainly unique. Although a plaintiff's duty is merely to provide "a short plain statement of a claim for relief which gives notice to the opposing party, [which] is all that is necessary in antitrust cases." *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554 (2d Cir.1977). Allegations of competition and competitive injury are critical to a viable antitrust claim, because the antitrust laws were designed for "the protection of competition." *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (*quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). As detailed

above, Holdings attempts to define a relevant market consisting of the disposition of asbestos-related personal injury claims and alleges improper means by which Defendants have inflated the value of their clients' personal injury claims to artificially high levels not justified on the merits. However, the Complaint fails to adequately allege that competition is a factor in this case.

■■■ Despite liberal standards of pleading generally applicable to antitrust complaints, "conclusory allegations which merely recite the litany of antitrust will not suffice." *Drug Emporium, Inc. v. Blue Cross of Western New York, Inc.*, 104 F.Supp.2d 184, 187 (W.D.N.Y.2000) (*citing John's Insulation, Inc. v. Siska Constr. Co.*, 774 F.Supp. 156, 163 (S.D.N.Y.1991)). Accordingly, in an antitrust action, "it is not … proper to assume that the [plaintiff] can prove facts that it has not alleged or that Defendants have violated the antitrust laws in ways that have not been" set forth. *George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2d Cir.1998) (citation omitted).

Holdings points to two paragraphs of the Complaint which it contends summarizes the harm to competition. However, ¶¶ 167 and 168 simply to allege improper means by which Defendants have inflated the value of their clients' personal injury claims to artificially high levels not justified on the merits. In *Volvo North America Corporation v. Men's International Professional Tennis Council*, 857 F.2d 55 (2d Cir.1988), where the plaintiffs charged the defendants with "coordinat[ing] horizontal competitors [in] banding together to eliminate competition among themselves and to use their collective power to limit the competitive opportunities of outsiders," *id.* at 66, the claim survived based on the attendant restrictions on competition. There is no allegation in the Complaint

that Defendants here acted to restrict or harm competition in the "market" of asbestos claim litigation. The closest Holdings can get is to claim is that through coercive acts aimed at plaintiff, the Defendants inflated the cost of those claims. That is insufficient.

Moreover, the construction urged by Holdings requires accepting that the claims constitute a "commodity", the litigation (or settlement) of which constitutes a "market". No support for this construction is offered. Thus, the allegations in the Complaint are insufficient to establish that any "market" exists in the first place. Such a novel notion as a competitive market for personal injury claims requires more than the conclusory allegation as that contained in ¶ 162 of the Complaint.

For the reasons stated, Claim III is dismissed.

## VI. *The Complaint Does not Allege a Valid Cause of Action for Violation of the Federal Racketeer Influenced and Corrupt Organizations Act*

Claims IV, V and VI of the Complaint plead violations of the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* A civil RICO claim has three fundamental types of elements: racketeering activity, structure, and injury. A plaintiff must plead underlying predicate acts of racketeering enumerated in 18 U.S.C. § 1961(1), but merely doing that does not make a RICO claim. A plaintiff must also tie those acts of racketeering into one of the structural matrices of "person[s]," "enterprise[s]," and "pattern[s] of racketeering activity" set forth in the three substantive subsections of 18 U.S.C. § 1962, or plead a conspiracy to violate one of those subsections, and must also establish injury to its business or property that is proximately caused by the

violation, 18 U.S.C. § 1964(c). Because Holdings has failed to plead the underlying predicate acts under RICO adequately, the claims are dismissed.

### Holdings Has Not Alleged Predicate Acts of Extortion

The predicate acts of extortion in this case revolve around the Defendants' alleged threats, made repeatedly and forcefully over a period of years, to inflict ruinous litigation on anyone who got in the way of their litigation strategy and to encourage other plaintiffs' asbestos lawyers to do the same.

Extortion under The Hobbs Act is defined as follows:

> The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951 (1992).

The parallel provision of the District of Columbia provides that a person commits the crime of extortion if:

> [t]hat person obtains or attempts to obtain the property of another with the other's consent which was induced by wrongful use of actual or threatened force or violence or by a wrongful threat of economic injury . . .

D.C.Code § 22-3851.

The extortion paradigm is "Give me X or else I will do Y," and in this case the "or else" was the alleged threat of ruinous litigation at the hands of Defendants and others in the asbestos bar.

 Holdings' extortion claim fails however, because GAF's First Amendment

right to petition government[2] does not constitute "property" that can be extorted. Research has revealed no cases directly on point for the proposition that First Amendment rights are property under the Hobbs Act. The use of the Hobbs Act in connection with a First Amendment right is indeed novel and ingenuous.

The Second Circuit endorses an "admittedly expansive" view of the concept of property under the Hobbs Act. *See United States v. Arena*, 180 F.3d 380, 392 (2d Cir.1999), *cert. denied*, 531 U.S. 811, 121 S.Ct. 33, 148 L.Ed.2d 13 (2000). This expansive view includes "in a broad sense, any valuable right considered as a source or element of wealth." *United States v. Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970).

Both the Second Circuit and numerous judges in this district have sustained RICO and/or Hobbs Act convictions under the theory that democratic participation in union affairs guaranteed by the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411, are property rights.[3] *See United States v. Bellomo*, 176 F.3d 580, 592-93 (2d Cir.) (the right to democratic participation in a union election is property and its intangible nature does not divest it of protection under the Hobbs Act), *cert. denied*, 528 U.S. 987, 120 S.Ct. 447, 145 L.Ed.2d 364 (1999); *United States v. Bellomo*, 954 F.Supp. 630, 642 (S.D.N.Y.1997) ("Every judge in this district to consider the matter has found that union members' rights to free speech and democratic participation in union affairs are property for the purposes

---

**2.** Lobbying activities directed towards influencing Congressional policies constitute an exercise of the First Amendment right to petition government. *See Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C.Cir.1968).

**3.** The LMRDA Bill of Rights, 29 U.S.C. § 411, grants to union members democratic rights such as freedom of speech and assembly, the right to vote in union elections, and a guarantee of due process in disciplinary proceedings.

of the Hobbs Act." (citations omitted)); *United States v. District Council of New York City and Vicinity of United Brotherhood of Carpenters and Joiners of America,* 778 F.Supp. 738, 756 (S.D.N.Y.1991) (intangible right of union members to democratic participation is a property right under the Hobbs Act); *United States v. International Brotherhood of Teamsters,* 765 F.Supp. 1206, 1210 (S.D.N.Y.) (the Teamsters' right to democracy and self-governance under the LMRDA are extortable property under the Hobbs Act), *appeal dismissed,* 1991 WL 346072 (2d Cir. Sept. 17, 1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 975, 117 L.Ed.2d 139 (1992); *Rodonich v. House Wreckers Union,* 627 F.Supp. 176, 178–79 (S.D.N.Y.1985) (union rights arising under the LMRDA are no exception to the rule that intangible business rights are property under the Hobbs Act). *Accord United States v. Debs,* 949 F.2d 199 (6th Cir.1991), *cert. denied,* 504 U.S. 975, 112 S.Ct. 2945, 119 L.Ed.2d 569 (1992); *United States v. Local 560,* 780 F.2d 267 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986).

In finding intangible democratic rights to constitute "property" under the Hobbs Act, the Honorable Lewis A. Kaplan reasoned in *Bellomo* that the union members' "rights to participate effectively in their affairs have direct economic value because [of] the advancement of the members' economic interests ..." 954 F.Supp. at 643. Yet while the right to petition Congress may have some economic value to those who are attempting, in one legitimate manner or another, to influence legislation or the legislative process, it does appear distinguishable from the rights guaranteed union members under LMRDA.

Participation in union affairs is more clearly "economic" in nature than petitioning government since the *raison d'etre* of a union is to secure the economic rights of its members. *See Id.* at 643. Under *Tropiano,* the concept of property includes, "any valuable right considered as a source or element of wealth." *United States v. Tropiano,* 418 F.2d at 1076.

Petitioning government for economically favorable legislation, even if by an interested business entity, cannot be considered a "source or element of wealth" without unreasonably expanding the scope of the definition of "property" covered by the Hobbs Act. The right to participate in union affairs is directly related to the ability of a union member to improve his or her working conditions or salary and to retain his or her job. By contrast, there is no direct or inherent connection between the ability of citizens to lobby government to enact legislation and their ability to maintain or increase their personal wealth. The legislative process simply contains too many uncertainties, variables and hurdles for there to be a direct nexus between the exercise of a right to petition government and the acquisition of economic wealth.

Holdings also cites cases where the right to conduct business and provide abortion services has been held to constitute "property" capable of protection under the Hobbs Act. *See, e.g. Rodonich v. House Wreckers Union,* 627 F.Supp. 176, 178–79 (S.D.N.Y.1985) (intangible business rights constitute "property"); *United States v. Zemek,* 634 F.2d 1159, 1174 (9th Cir.1980) ("right to solicit business free from threatened destruction" constitutes "property"); *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1350 (3d Cir.) (right to provide abortion services, employees' right to employment, and patients' right to contract with center constitute "property"). The right to provide abortion services is in effect an application of the more general right to do business. *See id.* at 1350. None of these cases involve a deter-

mination that a First Amendment right constitutes extortable property.

Therefore, the right to petition Congress is considered to be fundamentally different from the right to do business or the right to participate in democratic union affairs or to improve one's economic situation. Although the exercise of the right to petition may sometimes be linked with a desire to achieve economic gain, the connection between petitioning and the procurement of wealth is neither strong nor direct. Thus, the right to petition Congress is not properly included within the concept of Hobbs Act "property."

### D.C.Code § 22–3801

The definition of "property" under § 22–3801 of the D.C Code is defined as "anything of value," and includes real property, tangible or intangible personal property, and services. Though this definition "is not limited" to the examples set forth in the definition, D.C.Code § 22–3801(3), D.C.Code § 22–102 defines "anything of value" as including "not only things possessing intrinsic value, but bank notes and other forms of paper money, and commercial paper and other writings which represent value."

According to *Jeffcoat v. United States*, 551 A.2d 1301, 1303 (D.C.1988), an item may constitute property even if the plaintiff cannot demonstrate its "specific monetary worth", *id.* at 1303, and the value of something should be determined by its "useful functional purpose." Yet the item must at least have monetary worth of some degree even if less than "the smallest coin" referred to by the court in *Jeffcoat*. No authority is provided, and research has uncovered none, for the notion that a constitutional right falls into the same category as the negotiable items of monetary value referred to in the applicable statutes. Even if FACA had directly permitted GAF to retain its wealth, it does not follow that

the right to petition government for the enactment of FACA necessarily increases wealth.

Accordingly, because the right to petition Congress does not constitute "property", Holdings has failed to allege extortion in violation of the D.C.Code.

The Defendants have also relied upon what the Second Circuit stated in *United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999): "[A] threat to cause economic loss is not inherently wrongful; it becomes wrongful only when it is used to obtain property to which the threatener is not entitled." *Id.* at 70. The threats alleged in the Complaint are economic in nature. *See, e.g.,* Complaint ¶¶ 9, 101, 129, 131 and Pl. Mem. at 39 ("To be sure this is not a case in which the threats involved physical violence . . . [H]ere, the 'or else' is a threat of purely economic harm."). The "property" at issue here is GAF's right to petition Congress, and the alleged Hobbs Act violation can survive only if the Defendants had no right to seek that "property."

Holdings has asserted three arguments to establish that the Defendants' alleged conduct was "inherently wrongful" under the Hobbs Act. First, that *Viacom International Inc. v. Icahn*, 747 F.Supp. 205 (S.D.N.Y.1990), and the Second Circuit's decision in *United States v. Zappola*, 677 F.2d 264, 269 (2d Cir.), *cert. denied*, 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982), stand for the proposition that "extortion may arise simply from the wrongfulness of the conduct," and that the existence of a wrongful objective in thus unnecessary. (Holdings' Mem. at 47). Holdings then states that *Zappola* and *Viacom* "were both decided after *United States v. Clemente* . . . on which defendants rely." (*Id.*) However, *Jackson* postdates both *Zappola* and *Viacom* and is fatal to Holdings' argument.

At the time it decided *Jackson*, the Second Circuit was aware of the *Zappola* decision, as it cited *Zappola* for an uncontroversial proposition regarding the Hobbs Act's legislative history. *See Jackson*, 180 F.3d at 68. However, the court in *Jackson* did not accept or even acknowledge the proposition from *Zappola* upon which plaintiff now seeks to rely (*i.e.*, that a threat can be wrongful regardless of its objective). Instead, the Second Circuit implicitly rejected *Zappola* in the context of economic threats by holding that a threat of economic harm is wrongful only when used to obtain property to which the threatener is not entitled. *Id.* at 68.

In its second effort to support its "inherently wrongful" assertion, Holdings actually embraces *Jackson's* holding that a threat may be "inherently wrongful" when it consists of "a threat of harm to a person's reputation." However, as the Complaint indicates, the Defendants are alleged to have threatened purely economic harm, and not harm to Holdings' reputation.

Third and last, according to Holdings, the courts in *United States v. Tobin*, 155 F.3d 636 (3d Cir.1998), *cert. denied*, 525 U.S. 1171, 119 S.Ct. 1094, 143 L.Ed.2d 94 (1999), and *United States v. Sturm*, 870 F.2d 769 (1st Cir.1989), indicated that a threat of economic harm may support a Hobbs Act violation regardless of whether the defendant was entitled to the property it sought. (*See* Holdings Mem. at 48 & n. 21). However, in *Sturm*, the First Circuit stated that "for purposes of the Hobbs Act, the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property." 870 F.2d at 773. And in *Tobin*, the Third Circuit adopted the reasoning of *Sturm* when it held that "the claim-of-right defense applies ... so long as the

threats involved are purely economic." 155 F.3d at 640. These cases are not inconsistent with the Second Circuit's decision in *Jackson*, and thus the alleged economic threats at issue here are not inherently wrongful.

Threats of litigation, and even threats of meritless litigation or the actual pursuit of such litigation, have been held not to constitute acts of extortion. *See, e.g., Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir. 1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract ... does not constitute extortion."); *I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265, 266–67 (8th Cir.1984) (holding that threats to sue, although characterized as extortion in plaintiff's complaint, do not constitute predicate acts of racketeering under RICO because threats to bring even groundless civil actions do not involve force or violence); *Nakahara v. Bal*, No. 97 Civ.2027, 1998 WL 35123, at *7 (S.D.N.Y. Jan. 30, 1998) (noting that numerous courts in the Second Circuit and other jurisdictions have held that "the threat of litigation or the initiation of unjustified lawsuits constituting malicious prosecution cannot alone form a predicate act for purposes of RICO"); *Crane Constr. v. Wal–Mart Stores, Inc.*, No. 93–2803, 1996 WL 495550, at *4 (W.D.Tenn.1996) ("The threat of litigation does not amount to a predicate act of extortion."); *Morin v. Trupin*, 711 F.Supp. 97, 106 (S.D.N.Y. 1989) ("[T]he threat by an attorney to bring a lawsuit is not a predicate RICO act."); *von Bulow by Auersperg v. von Bulow*, 657 F.Supp. 1134, 1143 (S.D.N.Y. 1987) (malicious prosecution is not a predicate act for RICO purposes). Thus, even accepting Holdings' allegations that defendants threatened "economically ruinous litigation" (Compl. ¶¶ 148, 166), and that the threatened lawsuits lacked merit, Holdings has not pleaded extortion, which is a prerequisite of a violation of the Hobbs Act.

### Holdings Has Failed to Allege With Sufficient Particularity the Predicate Acts of Mail and Wire Fraud

 Claims IV and V of the Complaint assert that the Baron & Budd Defendants, the firm of Baron & Budd (Count IV) and Fred Baron and Russell Budd individually (Count V), committed numerous predicate acts of mail and wire fraud, all focused around obtaining settlements (and, of course, contingency fees) on behalf of claimants who were not sick and could not identify the asbestos-containing products to which they had been exposed decades earlier. These predicate acts are in addition to the extortion and witness tampering alleged against all Defendants in Count VI.

 The parties agree that mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343, are established by three elements, that the defendant (i) devised a scheme or artifice to defraud (both statutes), (ii) used the mails (§ 1341), interstate courier services (*id.*), or interstate wires (§ 1343) in furtherance thereof, and (iii) did so with specific intent to defraud (DB 54, *citing United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991), *cert. denied*, 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993)). The offense is complete upon the mailing or wire transmission, and each such mailing or transmission is a separate offense. *United States v. Eskow*, 422 F.2d 1060, 1064 (2d Cir.), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970). The matter mailed or transmitted need not itself be false or fraudulent, although it must constitute an "essential part of the scheme" to defraud. *United States v. Tocco*, 135 F.3d 116, 124–26 (2d Cir.) *cert. denied*, 523 U.S. 1096, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998); *see In re Sumitomo Copper Litigation*, 995 F.Supp. 451, 456 (S.D.N.Y.1998) (noting that "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)" in cases in which the communications are not themselves misleading). Similarly, injury to the victim or victims is not an element of the offense, *see United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.1996), although a private civil RICO plaintiff does not have standing to sue under 18 U.S.C. § 1964(c) unless it has in fact been injured "by reason of" the violation. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (noting that a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation"). In this Circuit, proximate causation in mail fraud cases generally means reliance on misrepresentations. *Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). The requirements of Rule 9(b) of the Federal Rules of Civil Procedure must be complied with when mail and wire fraud are invoked as predicate acts in a civil RICO action.

### The Scheme to Defraud

As alleged in the Complaint, the Baron & Budd Defendants' scheme to defraud consists of a campaign to extract settlement dollars from asbestos defendants by creating and proffering false product identification and medical evidence in circumstances where, as the Baron & Budd Defendants know and count upon, it is impossible for asbestos defendants even to investigate, let alone properly litigate, all but a tiny fraction of the claims.

As the Complaint alleges, the scheme begins with the recruitment of tens of thousands of "plaintiffs" from across the country. The next step is to inundate

asbestos defendants with so many claims that it is impossible for the companies to defend themselves against each individual claim. The Baron & Budd Defendants make these solicitations without regard for whether the recruited "plaintiffs" suffer from any asbestos related illness.

The Complaint then alleges that, having secured their nominal claimants, the Baron & Budd Defendants then proceed to transform meritless claimants into viable plaintiffs by, *inter alia:* (1) manufacturing or falsifying medical evidence to support claims of illness; (2) ensuring that the plaintiffs confidently identify asbestos products, most of which have not been manufactured or sold for over thirty years; (3) ensuring that the plaintiffs identify only those products made by solvent companies; and (4) instructing plaintiffs about how to provide certain "facts" in response to deposition questions as necessary to cover up defects in their claims.

The fruits of these efforts are then propounded to the courts, and also to Holdings with the ultimate expectation that these materials will be relied upon either for the truth of their contents and the potential liability they are intended to represent. Finally, the Baron & Budd Defendants seek to ratchet up the value of such non-sick cases by tying the settlement of such cases to the settlement of claims by the few legitimately sick clients that remain.

With regard to the Baron & Budd Defendants' efforts to manufacture false evidence and false testimony, the Complaint attaches a copy of the Memorandum which counseled the creation of false testimony and instructed the clients on what "facts" to provide in response to certain deposition questions without so much as an acknowledgment of the obligation that the client answer all questions truthfully.

As alleged in the Complaint, true investigation of any significant percentage of claims was a physical impossibility and the asbestos defendants had no choice but to take the results of the scheme to defraud at face value.

### The Use of the Jurisdictional Means

The Memorandum, false affidavits and other documents are alleged to have been transmitted via interstate mail, couriers, or wires (the "jurisdictional means") as incident to the scheme to defraud. The centrality to the scheme to defraud of the use of the jurisdictional means is evident in the case of the settlement affidavits, for they were transmitted directly to GAF's agent to complete settlement transactions and obtain payment for Baron & Budd.

Although the Memorandum was only transmitted among insiders, that transmission is alleged to be central to the creation and delivery of the perjured testimony.

The Defendants contend that the Complaint fails to explain how the Baron & Budd Memorandum is false and misleading. Though the Memorandum was not a fraudulent representation itself, it was a recipe for fraudulent representations. The allegation is that it taught witnesses how to lie, and served as a foundation for additional coaching on how to lie well, it reached many of its recipients by mail, courier and facsimile.

### The Fraud Allegations Do Not Meet the Requirements of Rule 9(b)

Although it may plead mail and wire fraud sufficiently as to the elements discussed above, the Complaint fails to adequately allege specific incidents of fraudulent conduct with sufficient particularity to satisfy the Federal Rules with respect to the specific dates, times and contents of the fraudulent statements. According to the Defendants, without such information, they are deprived of a meaningful opportu-

nity to respond to the allegations of fraud. Because Holdings has not alleged which of the over 900 cases specifically referenced in the Complaint (in which the Baron & Budd Memorandum was used) included fraudulent product identifications and/or other false testimony, this claim must be dismissed.

Holdings argues that because the alleged "specifics" raised by Defendants, such as the dates and times of the fraudulent conduct at issue, are exclusively within the Baron & Budd Defendants' own knowledge, Rule 9(b) permits such allegations to be made more generally. *See DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) (*citing* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1298, at 406 (1969)). However, Holdings was actively involved in as a party in hundreds of cases, participated in depositions and obtained other discovery. Holdings has not pointed to a specific deposition, product identification, or affidavit from those cases that supports its claim. Moreover, Holdings has held the Memorandum in its possession for over three years. A failure to specify any individual false statements and the dates and times they were transmitted is fatal to Holdings' claim.

Holdings relies on *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061 (S.D.N.Y.1983), to support its contention that the failure to plead specific instances is sufficient in this case. In *Beth Israel,* the defendants were charged with numerous RICO violations arising from an expansive fraudulent scheme to sell strategically useful litigation information to certain plaintiff's lawyers for use in medical malpractice actions. *Id.* at 1063–64. Although the complaint carefully alleged the nature of the defendants' alleged scheme to defraud, defendants sought dismissal under Rule 9(b) on the grounds that the complaint did not identify the dates, times, or contents of the mailings or telephone calls involved in the alleged fraud. *Id.* at 1070–71. The court rejected this effort, stating:

> In view of the complaint's detailed description of the Defendants' scheme, however, the failure to describe particular letters or telephone calls is not fatal to the complaint.

*Id.* at 1071. *See also Moy v. Adelphi Institute, Inc.,* 866 F.Supp. 696, 703 (E.D.N.Y.1994) (rejecting motion to dismiss RICO claims under Rule 9(b): "The failure to describe particular telephone calls or to identify the exact speaker is not fatal to the Complaint as it amply details the existence of a scheme to defraud students, and it also reveals that harm and injury to Plaintiffs was contemplated by the Defendants' plan.").

This Court held in *Terra Resources I v. Burgin,* No. 85 Civ. 2810, 1986 WL 4064 (S.D.N.Y. Apr. 3, 1986) that *Beth Israel* was inapplicable where the complaint, "*does not specifically identify* a single date, place or *manner of communicating these misrepresentations,* nor does it identify which defendant made the offending statements.*" Id.* at *5 (emphasis added); *see also Bingham v. Zolt,* 683 F.Supp. 965, 974 (S.D.N.Y.1988) (plaintiff's reliance on *Beth Israel* unavailing where plaintiff failed to adequately particularize the predicate acts).

The holding in *Moy,* the other case relied upon by Holdings, also does not provide support for its position. The *Moy* court emphasized the plaintiff's detailed allegations of "who, what, where, and when," *id.* at 702, allegations which are absent from the Complaint. The court then held that the "failure to describe particular telephone calls or to identify an exact speaker is not fatal to the complaint as it amply details the existence of a

scheme to defraud," including providing "ample detail as to the purpose of the mailings served within Defendants' scheme" and detailing the "total amount of loan money received by [Defendants] through the mail system." *Id.* at 703. In the case at bar, Holdings does not identify the actions affected by the scheme to defraud, either by number, category, time or any other characteristic. To make the allegation, some knowledge and description is required. The specificity of the information provided in *Moy*, has not been achieved and thus the Complaint is defective.

Holdings also contends that a relaxed standard of pleading applies in "wide ranging and complex" civil RICO cases, relying on *In re Sumitomo Copper Litigation*, 104 F.Supp.2d 314 (S.D.N.Y.2000). But the complaint in *Sumitomo* was found to assert a detailed conspiracy to manipulate and corner the market for physical copper and copper futures. As noted by the court, the plaintiffs pleaded specific predicate acts of mail and wire fraud in the complaint, and set forth numerous specific dates, authors and recipients of faxes, false warrant confirmations and wire transfers. The Complaint here does not contain such specific instances and has thus fallen short of pleading the predicate acts of mail and wire fraud. The claim is therefore dismissed with leave to replead.

### Holdings Has Failed to Allege Predicate Acts of Witness Tampering

Holdings alleges that all the Defendants have violated the witness tampering statute, 18 U.S.C. § 1512. Specifically, it asserts that Defendants "attempted to and did use intimidation, threatened, and corruptly persuaded former asbestos producers" so that they would not testify before Congress. Holdings contends that witness tampering was committed against James Kelly, Samuel Heyman, and other members of the CAR.

18 U.S.C. § 1512(b) provides:

Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—(1) influence, delay or prevent the testimony of any other person in an official proceeding; (2) cause or induce any person to—(A) withhold testimony, or withhold a record, document or other object, from an official proceeding; ... shall be fined under this title or imprisoned not more than ten years or both.

§ 1512(a)(1) also provides that "the term official proceeding means ... a proceeding before Congress." The Complaint alleges that the Defendants threatened Kelly with the destruction of his company if he were to testify before Congress in support of FACA. Further, the Complaint alleges acts of witness tampering during the meetings of February 14, April 8, and April 12, 1999.

### Plaintiff Has Failed Adequately to Plead the Involvement of Defendants in Alleged Witness Tampering Relating to James Kelly

The paragraph of the Complaint which sets forth the witness tampering claim relating to Kelly does not allege who threatened Kelly, or how the Defendants supposedly aided and abetted that threat. Compl. ¶ 104. Instead, it merely states the language of the aiding and abetting statute, 18 U.S.C. § 2, and states that the Defendants violated it.

Holdings contends that its allegations are "not mere boilerplate" and notes that the pleading requirements of Rule 8(a) apply. The allegations are still inadequate. As this Court stated in *Morin v. Trupin*, 747 F.Supp. 1051 (S.D.N.Y.1990),

with respect to *any* predicate act, *notice pleading itself* requires sufficient specificity to permit a defendant to discern whether he is being charged with primary conduct or as an aider or abettor, and some idea of the manner in which he is charged with having aided and abetted or committed such primary conduct. *Id.* at 1066–67 (emphasis added). Although at least one of the individual defendants is charged with a primary act of witness tampering, Holdings' allegations make it impossible to determine which defendant is so charged, and as to each and every other defendant who is charged with aiding and abetting, the Complaint fails to provide those Defendants with any idea of the manner in which they supposedly aided or abetted the witness tampering. Paragraph 104 of the Complaint alleges that the individual defendants "counseled, commanded, induced, procured, and/or caused such threat to be communicated to Mr. Kelly." However, this laundry list is nothing more than a recitation of the language of the aiding and abetting statute, and thus adds nothing to the Defendants' understanding of the charge.

Even under notice pleading requirements, Holdings has fallen short of pleading witness tampering with respect to Kelly. It is not alleged, for example, whether attendance at a particular meeting is alleged to constitute aiding and abetting. ***The Complaint Does Not Adequately Allege That Samuel Heyman or Any CAR Members Were the Victims of Witness Intimidation***

Although the Complaint alleges that more than one asbestos producer was coerced or corruptly persuaded into withholding its testimony from Congress (*see* Compl. ¶¶ 185, 210, 230), the only specific factual allegations in the Complaint relate to the alleged act of witness tampering against Kelly.

The second victim under Holdings' theory is former GAF Chairman, Heyman, and the additional victim is actually a group of victims, the entire membership of the CAR. According to Holdings, the allegations in the Complaint regarding meetings of February 24, April 8 and April 12, 1999, all indicate that the Defendants threatened CAR members in general, and Heyman in particular, with the intent of preventing their testimony before Congress.

However, in attempting to establish that it has pleaded Defendants' requisite intent to prevent or influence testimony at an official proceeding, Holdings has stretched the Complaint. For example, Holdings cites Paragraphs 108 through 113 of the Complaint when it asserts not only that Rice sought to intimidate asbestos defendants at the meeting of February 24, 1999, but also that "[t]he sole object of the meeting was to obliterate support for the act *by forestalling or eliminating testimony before Congress.*" (Holdings' Mem. at 56 (emphasis added)). Yet the Complaint does not contain the underscored allegation, nor does it assert that the goal of the meeting was to prevent or influence Congressional testimony. Holdings instead suggests in the Complaint that the goal of the meetings was to convince asbestos manufacturers not to support the FACA, but an attempt to convince a party not to support a legislative measure is simply not the same thing as a request that the party testify falsely or not testify at all. Holdings states that "defendants' demands for ... letters [expressing opposition to the FACA] was no more and no less than a demand that the companies misrepresent to Congress their actual view of the Act." A letter expressing opposition to legislation is not the same as stating one's opposition to the legislation in testimony given before Congress.

Holdings has noted that there is an allegation in Paragraph 230 of the Complaint that "defendants attempted to and did use intimidation, threatened, and corruptly persuaded former asbestos producers with the intent to prevent their testimony before Congress and to cause them to withhold their testimony from Congress, in violation of 18 U.S.C. § 1512(b)." Holdings contends that this allegation, conclusory though it may be, is "more than sufficient" under the notice pleading standard of Rule 8(a). (Pl. Mem. at 57). Holdings is wrong, however, for "conclusory statements [cannot] substitute for minimally sufficient factual allegation." *Furlong v. Long Island College Hospital,* 710 F.2d 922, 927 (2d Cir.1983); *see also Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996) ("While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice."). At a minimum, Holdings would need to allege an intent to induce someone not to testify or to testify falsely at an actual official proceeding. Such an allegation is lacking. Holdings asserts that at the meeting of February 24, Motley threatened GAF and Heyman. However, neither in its memorandum nor in the Complaint does Holdings claim that Motley's alleged threat was made with the specific intent of preventing Heyman from testifying before Congress.

Holdings also states that at the April 8 meeting, Rice threatened "asbestos defendants who might show support for the Act." Again, the Complaint does not include the speculative assertion that certain asbestos defendants "might" testify on behalf of the FACA, nor does it allege that Rice sought to convince asbestos defendants not to testify before Congress. With respect to the April 12 meeting, Holdings cites Paragraph 121 of the Complaint and asserts that "[d]efendants Weitz and Gordon made a final attempt ... to intimidate GAF and prevent Samuel Hey-

man from testifying in support of the Act." However, Paragraph 121 does not mention Heyman at all, and alleges that Weitz and Gordon expressed their desire to defeat the FACA and their refusal to meet with asbestos defendants who supported it. There is no allegation that Messrs. Weitz or Gordon demanded that this opposition be expressed through a refusal to testify before Congress, or through the giving of false testimony.

Given the absence of any specific allegations indicating that the Defendants intended to convince former asbestos manufacturers (other than James Kelly) not to testify before Congress, or to testify falsely, Holdings alleges that this intent can be inferred from facts alleged in the Complaint. These facts, however, consist of only three. First, Holdings states that Kelly was "known to be expecting to testify," and second, that the Defendants had been informed that Heyman "had the same expectation." Holdings contends that because the Defendants allegedly knew that Kelly and Heyman expected to testify before Congress, the Defendants' attempts to defeat the FACA necessarily and inherently reflected an intent to coerce every single member of the CAR into testifying falsely before Congress, or into not testifying at all. However, no subpoena, no hearing, no specific opportunity or obligation to testify is set forth in the Complaint.

The third of the facts which Holdings contends supports an inference of intent, *i.e.,* that "[i]t would be routine, when hearings were scheduled, for Congress to request the appearance of an industry witness, and the CAR members ... would have been the obvious choices" (Defendants' Brief at 57–58) is in fact not alleged in the Complaint. It is inconsistent with the standards for resolving a motion to dismiss to have this Court draw inferences

from facts not pleaded in the Complaint. *See e.g., Chauvet v. Local 1199, Drug, Hosp. and Health Care Employees Union,* Nos. 96 Civ. 2934 *et al.,* 1996 WL 665610, at *8 (S.D.N.Y. Nov. 18, 1996) (under standards applicable to a motion under Rule 12(b)(6), "the Court is not required to infer facts ... which are not pleaded in the Complaint.")

In sum, Holdings has not adequately pleaded that the Defendants intended to prevent or influence the testimony of Samuel Heyman or any other CAR member.

### Threats of Litigation Cannot Be a Basis for Witness Tampering

 A violation of the witness tampering statute requires the use of threats, physical force, intimidation or corrupt persuasion. *See* 18 U.S.C. § 1512(b). However, it has been held in *Philadelphia Reserve Supply Company v. Nowalk & Associates, Inc.,* Civ. A. No. 91–0449, 1992 WL 210590 (E.D.Pa. Aug. 25, 1992) ("Nowalk"), that threats of litigation do not form the basis of a witness tampering allegation.

In its civil RICO claim in *Nowalk,* the plaintiff asserted that defendants committed predicate acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, and obstruction of justice and witness intimidation in violation of 18 U.S.C. §§ 1503 and 1512. *Id.* at *5. In support of the witness intimidation claim, the plaintiff asserted that during meetings between the parties, defendants threatened that if the plaintiff filed suit against them, they would "counterattack" and cause the plaintiff to face "financial ruin." Given these factual allegations, the Court rejected the plaintiff's claim that defendants unlawfully engaged in witness intimidation, and stated that defendants' threats did not amount to a violation of § 1512. In so holding, the court reasoned as follows:

In a litigious society such as ours, it is thin-skinned to think that a threatened counter-suit, or otherwise, in response to an initial threat of legal action is witness intimidation rather than a mere puffing or power play among negotiators. One cannot threaten to sue someone and expect there to be no reaction or response. In sum, waging a counterattack to civil litigation, without factual allegations of unlawful means, does not amount to witness intimidation.

*Id.* at *6.

Other courts have also rejected claims that threats of future litigation, or the initiation of actual litigation, constitute witness tampering. *See, e.g., Aamco Transmissions, Inc. v. Marino,* Civ. A. Nos. 88–5522, 88–6197, 1990 WL 106760 (E.D.Pa. 1990) (holding in civil RICO action that alleged threats intended to induce third parties to sue RICO plaintiff do not support a violation of 18 U.S.C. § 1512); *Heffernan v. Hunter,* No. Civ. A. 97–6041, 1998 WL 150953 (E.D.Pa. March 26, 1998) (holding that 42 U.S.C. § 1985(c), which prohibits conspiracies to deter a witness from attending court or testify freely in any pending matter, is not violated by the filing of litigation, because such litigation is not "force, intimidation or threat," and to hold otherwise would chill the right of private parties to petition the government).

Moreover, the litigation which Defendants supposedly threatened to bring was not on behalf of an "unrelated third party"; it was brought on behalf of the very clients whose interests the defendant firms are committed to represent. As such, any threats of litigation were not made with a "corrupt purpose," *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1040 (11th Cir.2000), and such threats do not support a witness tampering claim.

The reasoning of these cases, and especially that of the *Nowalk* decision, will be applied here to conclude that the threat of "economically ruinous litigation" against Georgia–Pacific fails to constitute a violation of the witness tampering statute.

For the reasons stated, Claims IV through VI are dismissed with leave granted to replead the allegations of mail and wire fraud.[4]

**The Seventh Claim For Relief Does Not State a Valid RICO Conspiracy Claim**

■ Claim VII of the Complaint alleges a RICO conspiracy claim. When a plaintiff has failed to satisfy the pleading requirements for a substantive RICO violation, any claim of a RICO conspiracy under § 1962(d) must fail. *See, e.g., Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244–45 (2d Cir.1999). Although Holdings relies upon *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), to argue that a claim under § 1962(d) may survive even when a substantive RICO claim has not been adequately pleaded, *Salinas* does not support that proposition.

In *Salinas* a sheriff was charged with violating a substantive RICO violation by accepting bribes from a prisoner. Though acquitted on the substantive grounds, he was convicted on the conspiracy count. He appealed on the ground that he could not be convicted of a subsection (d) conspiracy offense unless the government proved that he committed or agreed to commit two predicate acts. *Id.* at 61, 118 S.Ct. 469. In rejecting the argument, the Supreme Court stated, "the evidence showed that [the sheriff] committed at least two acts of racketeering activity when he accepted numerous bribes and that Salinas knew about and agreed to facilitate the scheme." *Id.* at 66, 118 S.Ct. 469. Salinas was thus convicted of participating in a conspiracy to commit the sheriff's substantive RICO offense. Here, in contrast, the Complaint does not sufficiently allege a substantive RICO violation. Thus *Salinas* does not remove the Holdings' burden to adequately allege an underlying substantive RICO violation as a prerequisite to alleging a RICO conspiracy claim. *See Cofacredit*, 187 F.3d at 244–45.

For these reasons, Claim VII is dismissed.[5]

**VII. The Complaint Alleges a Valid Cause of Action for Breach of Contract**

■ Claims VIII and IX allege that Defendants Weitz & Luxenberg and Ness Motley breached the Futures Agreements each entered into with Holdings through its agent, the CCR. The Defendants challenge the claim for breach of contract on the basis that Holdings has failed to allege breach properly because those agreements permit the exercise of discretion, and Holdings has not alleged that the CCR was "ready, willing and able" to adequately perform its obligations at the time of the breach.

The Futures Agreements state:

Plaintiff Counsel [Defendants here] therefore agrees, unless in the exercise of its independent professional judgment it determines otherwise, to recommend

---

4. Because the Complaint fails to plead adequately the predicate acts of extortion, witness tampering and mail and wire fraud, the issues of continuity and standing under RICO are not reached.

5. If the predicate acts of mail and wire fraud are properly repleaded, and those pleadings satisfy the continuity and standing requirements of RICO, the conspiracy claim will be revisited as well.

that its clients seriously consider [ ] alternative dispute resolution . . .

In the Complaint, plaintiff alleges:

[Defendants'] failure to make the requisite recommendations is not the case-by-case exercise of independent professional judgment but is a preconceived, uniform plan being implemented without regard for the facts and circumstances of any individual case.

(Para. 254, 264)

The Defendants assert that the pleading is insufficient because Holdings has failed to make the simple and straightforward allegation that the Defendants' firms failed to exercise their independent professional judgment. While there is a distinction between that straightforward allegation and the actual allegation in the Complaint, it does not make the pleading insufficient.

■ The Complaint alleges a failure to exercise independent professional judgment. That it goes further and describes the nature of that failure (as a "preconceived, uniform plan . . . without regard for the facts and circumstances of any individual case"), is not fatal to the pleading. The Defendants claim there was no duty under the Futures Agreements to evaluate the claimants' suits on an individual basis, and since Holdings' claim only addresses the failure to evaluate on an individualized basis, the pleading is insufficient. However, the allegation must be read to contend that the Defendants' "preconceived, uniform plan" reflects a failure to exercise their professional judgment as required by the Futures Agreements, *even if* a case-by-case analysis is not required by the contract. Additionally, both New York and New Jersey law[6] impose an

implied covenant of good faith and fair dealing. The presence of unilateral discretion in contract does not excuse the parties from fulfilling their duties under the contract fairly and in good faith. *See Wilson v. Amerada Hess Corporation*, 168 N.J. 236, 773 A.2d 1121, at 1129 (2001); *M/A-COM Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.1990) (per curiam).

Therefore, the factual issue of whether Defendants satisfied their contractual obligation to exercise professional judgment is brought into play by the allegation in the Complaint. It does not merely raise the issue of whether a case-by-case analysis was undertaken. Whether Holdings can demonstrate such a failure to exercise independent, professional judgment, is an issue to be resolved at trial or on a motion for summary judgment.

The second objection of the Defendants is that Holdings has failed to allege that CCR was "ready, willing and able" to perform under the futures agreements. *See Penthouse Int'l, Ltd. v. Dominion Fed. Savings & Loan Ass'n*, 855 F.2d 963, 979 (2d Cir.1988) (under New Jersey law, plaintiff must prove "willingness and ability to perform"); *Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d 932, 934, 686 N.Y.S.2d 911 (3d Dep't 1999) (same under New York law).

The Complaint alleges:

To the extent that any conduct by plaintiff, or by the CCR on plaintiff's behalf, would otherwise be thought to be a condition precedent to Weitz & Luxenberg's performance . . . such conduct was excused because Weitz & Luxenberg anticipatorily breached the . . . Agreement by making it clear that the firm would

---

**6.** As previously noted, plaintiff argues that New Jersey law applies to the contract issues, including this one. At this stage, the choice of New Jersey or New York law does not materially effect the outcome. Therefore, no determination as to the applicable law is made. *See, e.g. Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998).

not in any circumstances make the requisite recommendations to its clients.

This allegation states that CCR's conduct under the contract was excused by Defendants' anticipatory breach and is susceptible to the inference that CCR would have performed its duties but for Defendants' anticipatory breach. On a motion to dismiss, a plaintiff is entitled to the benefit of just such an inference. *See Catskill Development, LLC v. Park Place Entertainment Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001).

Because the Complaint alleges the existence of a contract, that Defendants failed to exercise discretion in breach of the agreement, that the CCR was "ready, willing and able" to perform its obligations, and damages, the Complaint alleges a valid cause of action for breach of contract.

For these reasons Claims VIII and IX survive.

## VIII. *The Complaint Does Not Allege a Valid Cause of Action for Fraudulent Inducement*

Claim X of the First Amended Complaint alleges fraudulent inducement to enter into a contract to pay $200 million of an eventual $750 million settlement agreement. The claim fails under both New York and New Jersey law.

■ Under New York law, to sustain a claim for fraudulent inducement alongside a claim for breach of contract, one must plead any one of the following: (i) a legal duty separate from the duty to perform under the contract; or (ii) a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) special damages that are caused by the misrepresentation and unrecoverable as contract damages. *Blank v. Baronowski*, 959 F.Supp. 172, 180 (S.D.N.Y.1997) (*citing Bridgestone/Fire-*stone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996)).

Holdings contends the fraudulent inducement claim is based on a $200 million payment plaintiff made toward a $750 million settlement of certain asbestos claims in reliance on the Defendants' representations that they would perform under the Futures Agreement. The Futures Agreement itself is alleged to consist of CCR agreeing to toll the statute of limitations on numerous asbestos claims in exchange for a promise that, subject to the exercise of their professional judgment, Defendants Weitz & Luxenberg and Ness Motley would recommend to their non-sick clients that they seriously consider deferral of their claims.

However, ¶ 138 of the Complaint states that "the consideration for the Futures Agreements included CCR's agreement to settle some 50,000 pending asbestos cases for approximately $750 million." This allegation belies Holdings' contention that the settlement was an independent agreement and represents damages not recoverable in contract.

■ The claim apparently is that the partial settlement payment was made in reliance on the representation that the Futures Agreements would be complied with. Though Holdings contends this agreement is extraneous to the contract, and that damages arising therefrom could not be recovered in contract, the claim is not sufficiently distinguishable from the underlying contract claim. A viable fraudulent misrepresentation claim requires that the misrepresentation pertain to facts that are "collateral or extraneous" to the contract, *see, e.g. Bridgestone/Firestone*, 98 F.3d at 19, not that the plaintiff participated in a separate "event" based on statements contained in the contract, as plaintiff currently asserts.

 Further, damages sought on this count are recoverable as contract damages. As stated above, Holdings is in the position to collect the $200 million payment in damages if they prove breach of the contract and that the payment was part of the consideration for their performance. The allegations make this clear. As this Court has noted, "[i]f the Plaintiffs cannot allege any damages apart from damages also asserted for the fraud in the underlying ... contract ..., this fact alone is an indication that a court should dismiss the charge of fraudulent inducement." *Bruce v. Martin*, 1993 WL 148904 (S.D.N.Y.1993) (*citing*, 725 F.Supp. 1286, 1294 (S.D.N.Y.1989)).

New Jersey law is similarly unavailing to Holdings. *First Valley Leasing, Inc. v. Goushy*, 795 F.Supp. 693 (D.N.J.1992), which Holdings relies upon, does not address alleged fraud in the inducement or any purported misrepresentation of the Defendant's intention of abiding by his contract. *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F.Supp.2d 521 (D.N.J.1998), arose from alleged misrepresentation during the negotiation of a contract, but those alleged misrepresentations related to extrinsic facts surrounding the exclusivity of defendant's existing agreement with another distributor and were not part and parcel of the underlying contract. *Lo Bosco v. Kure Engineering, Ltd.*, 891 F.Supp. 1020 (D.N.J.1995), and *Coastal Group, Inc. v. Dryvit Systems, Inc.*, 274 N.J.Super. 171, 643 A.2d 649 (1994), are likewise distinguishable from the case at bar by virtue of the collateral nature of the alleged misrepresentations. As has been demonstrated, here Holdings attempts to allege fraudulent inducement based on the very terms of the underlying contract.

For these reasons, Claim X is dismissed.

### Conclusion

For the reasons stated, the Defendants' motion to dismiss is granted in part and denied in part. The *prima facie* tort claim (Claim I) and the tortious interference with contract claim (Claim II) are dismissed, the motion to dismiss the tortious interference with economic advantage (Claim II) is denied, the antitrust claim (Claim III) is dismissed, the RICO claim (Claims IV–VI) is dismissed for failure to plead predicate acts of witness tampering and extortion and to plead fraud with particularity, the RICO conspiracy claim (Claim VII) is dismissed, the motion to dismiss the contract claim (Claims VIII and IX) is denied and the fraudulent inducement claim (Claim X) is dismissed.

Leave is granted to replead within thirty (30) days of this opinion.

It is so ordered.